IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
v.                               )        No. 16-20094-SHM-tmp
                                 )
NICKEY ARDD,                     )
                                 )
        Defendant.               )
_____

AMENDED REPORT AND RECOMMENDATION
_____

On July 16, 2015, law enforcement officers with the Memphis Police Department ("MPD") arrested defendant Nickey Ardd after he allegedly purchased nine ounces of cocaine from undercover detectives who were posing as drug suppliers. At the time of Ardd's arrest, officers found a loaded Glock handgun tucked in his waistband. Later that day, officers executed a search warrant at Ardd's home and found, among other items, baggies of cocaine and marijuana, digital scales, and a Luger handgun with an obliterated serial number. On April 27, 2016, a federal grand jury returned a five-count indictment against Ardd, charging him with one count of possessing cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1), one count of carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c)(1)(A)(i), two counts of

being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and one count of possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k).

On September 22, 2016, Ardd filed a motion to suppress the evidence seized from his person and his residence, as well as a signed statement he gave to the police after his arrest. (ECF No. 23.)  Pursuant to an order of reference, on November 15, 2016, the undersigned magistrate judge conducted a suppression hearing.  The court heard testimony from MPD Detectives Harold Tellez, William Acred, and Jonathan Knowlton, and received into evidence eleven exhibits.  At the conclusion of the hearing, Ardd requested leave of court to file a post-hearing brief, which was granted.  Ardd filed his post-hearing brief on January 3, 2017, and the government filed its response on January 10, 2017.  (ECF Nos. 40, 42.)

The court has now considered the memoranda of law filed in support of and in opposition to the motion to suppress, the hearing testimony and exhibits, and the applicable law.  For the reasons below, it is recommended that the motion to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

**A.    The Search Warrant**

The court has carefully considered the testimony of Detectives Tellez, Acred, and Knowlton, and finds all three

witnesses to be credible. Therefore, the court will rely on their testimony in making its findings of fact.

Beginning sometime in 2014 or early 2015, Detective Harold Tellez, while working undercover as a drug supplier, was put into contact with Nickey Ardd. Ardd proceeded to engage in communications with Detective Tellez during which Ardd expressed interest in purchasing kilogram quantities of cocaine from the detective. On June 12, 2015, Ardd spoke with Detective Tellez and agreed to purchase nine ounces of cocaine from the detective at a price of $1,100 per ounce. Ardd and Detective Tellez arranged to meet on June 16 in the parking lot of a home furnishings store ("home store") located at 5280 Summer Avenue in Memphis, Tennessee. In anticipation of this meeting, on June 15, Detective Tellez swore out an affidavit for a search warrant for Ardd's person and his residence. The affidavit, which sought the seizure of drug proceeds and drug records, stated as follows:

> Detective Tellez has been assigned to the Organized Crime Unit since January 2006 and has been a Memphis Police Officer since February 1998. Detective Tellez has attended the Memphis Police Department's Basic Narcotic Investigation School and has participated in numerous drug investigations at the Federal and State levels. Detective Tellez has executed search warrants and made several arrests that have led to the seizure of both large sums of illegal drugs and drug proceeds.
>
> Detectives with the Organized Crime Unit received information from a reliable Confidential Informant (CI) about Ardd being involved in the sale and

-3-

distribution of powder cocaine in the city of Memphis. The CI observed Ardd possessing, storing and transporting both powder and crack cocaine in the past. Ardd has also contacted Undercover Officer 2860 (UC2860) by phone several times for the past year and has attempted to purchase kilograms of powder cocaine from the UC2860. Ardd also met in person with UC2860 on January 20, 2015 and said he would contact UC2860 when he was ready to purchase powder cocaine.

On June 12, 2015 Ardd made contact by phone with UC 2860 and said that he was ready to purchase 9 ounces of powder cocaine from UC2860 on June 16, 2015. Detectives using data bases and surveillance identified Ardd's residence as [XXXX] Castleman, Memphis TN 38118. Ardd pays the utilities at the location according to MLG&W [Memphis Light Gas & Water] databases and also has registered his vehicle at the address. Detectives have conducted surveillance at [XXXX] Castleman several times in the past and as recent as on June 15, 2015 and have observed Ardd's Porsche Cayenne in the driveway which he drives on a regular basis. Detective Tellez knows based on his experience and training, that drug traffickers often hide their assets/drug proceeds and retain drug records such as drug ledgers at their residence.

The Reliable [CI] has provided information in the past that has led to over 5 Felony drug arrests and convictions and the seizure of over 5 kilograms of powder cocaine, over 10 pounds of marijuana and over $500,000 in US currency.

Based on the above information, detectives will execute a reverse operation on 6-16-2015 in which UC2860 will deliver the powder cocaine to Ardd and then Ardd will be arrested. Upon Ardd being arrested for attempting to possess this cocaine, Detectives request permission to execute this search warrant.

(Ex. 8.)[1]    The affidavit included photographs of Ardd and his

---

[1]The testimony at the hearing established that UC2860, as referred to in the affidavit, was in fact Detective Tellez. The

residence on Castleman.  A Shelby County General Sessions Court Judicial Commissioner signed the warrant on June 15.

**B.   The Events of June 16, 2015**

On June 16, 2015, Detective Tellez checked out nine ounces of cocaine from the MPD evidence room for the purpose of using it in the reverse buy.[2]  He concealed the drugs in a styrofoam food container and placed the container inside a plastic shopping bag.  Detective Tellez and a Detective Florez, who was posing as Tellez's associate, waited in the home store parking lot in their undercover truck while other MPD officers with the Organized Crime Unit ("OCU") conducted surveillance nearby.[3] Shortly thereafter, Ardd arrived at the meeting location driving a Porsche Cayenne and accompanied by another individual.  As Ardd entered the parking lot, Detective Tellez walked up to the Cayenne and asked Ardd to display the buy money.  After Ardd showed the detective the money, Ardd parked his Cayenne next to the undercover truck and got into the front passenger's seat of the truck.  Detective Tellez sat in the back seat of the truck

court will hereinafter refer to Detective Tellez instead of UC2860, where appropriate.

[2]For purposes of clarity, the court will refer to the events that took place in the home store parking lot as a reverse buy, while recognizing that Ardd disagrees with this characterization of the events.

[3]A video of the reverse buy was recorded by detectives positioned in another car in the parking lot.  That video was introduced as Exhibit 2 and played at the hearing.

while Detective Florez sat in the driver's seat.

According to Detective Tellez, while inside the truck Ardd handed over the buy money to the undercover detectives.  As Detective Florez counted the money, Detective Tellez took the cocaine out of the container and handed it to Ardd.  Ardd proceeded to handle the cocaine while Detective Tellez boasted about its quality.  At that point, Detective Tellez gave the takedown signal, at which time the surveillance team surrounded the truck and arrested Ardd.  As Detective William Acred began searching Ardd, Ardd stated that he had a gun on him.  Detective Acred found a loaded Glock handgun tucked in Ardd's waistband.  The detectives also seized $9,811 in buy money.  Ardd was subsequently transported to OCU headquarters.  Meanwhile, MPD detectives, including Detectives Tellez and Acred, executed the search warrant on Ardd's residence.  Inside the master bedroom the detectives found, among other items, thirty-one baggies of cocaine, three baggies of marijuana, four digital scales, and a loaded Luger handgun with an obliterated serial number.

After the search of the residence, Ardd was questioned by Detectives Acred and Knowlton in an interview room at OCU headquarters.  Before the questioning began, Detective Acred read Ardd his Miranda rights.  He also gave Ardd an "Advice of Rights" form.  Under the heading "Your Rights," the form listed the following rights, each on a separate line:

-6-

You have the right to remain silent.

Anything you say can be used against you in court.

You have a right to talk to a lawyer for advice before we ask you any questions.

You have a right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering questions at any time.

(Ex. 3.) Ardd placed his initials next to each line. Under the heading "Waiver of Rights," the form stated:

I have read this statement of my rights and I understand what my rights are. No promises or threats have been made to me and no pressure, force, or coercion of any kind has been used against me. At this time, I am ready to answer questions without a lawyer present.

(Id.) Ardd signed and printed his name under the Waiver of Rights notice. Detectives Acred and Knowlton also signed the form as witnesses.

Detectives Acred and Knowlton then proceeded to question Ardd regarding the events leading to his arrest. Ardd stated he met Detective Tellez in the home store parking lot for the purpose of purchasing cocaine from the detective. Ardd admitted he had a gun on him and that he had planned to rob Detective Tellez of the cocaine. He stated he had been selling cocaine

-7-

for four or five years and made $500 to $1,000 per week.[4]  He also admitted to having cocaine and a firearm at his residence. Detective Acred then typed up Ardd's statement and gave it to him to review.  The front page of the statement contained the same <u>Miranda</u> warnings found on the Advice of Rights form, and Ardd once again placed his initials next to each line.  The last part of the statement read:

> Q: I will ask you to read this statement, and if you find it to be true and correct as you have given, I will ask you to initial the bottom of each page and place you [sic] signature along with the date and time on the line below.  Do you understand?
>
> A: Yes.

(Ex. 4.)  Ardd initialed each page of his written statement and signed, dated, and placed the time on the last page.  Ardd was calm and cooperative throughout the interrogation, never asked to have an attorney present, and never asked to stop the interview.

## C.   Motion to Suppress

In his motion to suppress, Ardd contends his Fourth Amendment rights were violated because the search warrant affidavit did not establish probable cause to support the search

---

[4]In Ardd's post-arrest statement, he stated he had purchased twenty-eight grams of cocaine from Detective Tellez (who Ardd knew as "Raul") in the past.  (Ex. 4 at 2.)  However, because this drug transaction was not mentioned in the search warrant affidavit, the court will not consider it in deciding whether the warrant was supported by probable cause.

of his residence.   Ardd further contends the search of his person was unlawful and the statement he made following his arrest was obtained in violation of his Fifth Amendment rights. In its response, the government argues the search warrant was supported by probable cause, the search of Ardd's person was a valid search incident to arrest, Ardd knowingly and voluntarily waived his Miranda rights prior to giving his post-arrest statement, and his statement was not obtained as a result of any police coercion.

## II. PROPOSED CONCLUSIONS OF LAW

### A.   Search of the Residence

#### 1.   Probable Cause

Ardd argues the search of his residence violated his Fourth Amendment rights because the search warrant was not supported by probable cause.   Specifically, Ardd contends the affidavit failed to establish a sufficient nexus between the place to be searched and the items to be seized.   The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.   To determine if probable cause exists, the task of the issuing judicial officer is "to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Franklin, 622 F. App'x 501, 508 (6th Cir. 2015). "The standard of review for the sufficiency of an affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" United States v. Greene, 250 F.3d 471, 478 (6th Cir. 2001) (quoting United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991)); see also United States v. Ugochukwu, 538 F. App'x 674, 678 (6th Cir. 2013). Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny. United States v. Baechtle, No. 2:13-cr-20054-SHM, 2015 WL 893348, at *7 (W.D. Tenn. Mar. 2, 2015) (citing United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2003)). Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit. United States v. Brooks, 594 F.3d 488, 492 (6th Cir. 2010).

The search warrant issued to Detective Tellez authorized officers to search Ardd's residence only if a specific condition was met, that condition being Detective Tellez's delivery of nine ounces of cocaine to Ardd and Ardd's subsequent arrest for attempting to possess that cocaine. This type of search warrant

is known as an "anticipatory warrant." An anticipatory warrant is "a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." United States v. Grubbs, 547 U.S. 90, 94 (2006) (internal citation omitted); see also United States v. Miggins, 302 F.3d 384, 395 (6th Cir. 2002) (quoting United States v. Jackson, 55 F.3d 1219, 1223 (6th Cir. 1995)) ("An anticipatory search warrant is a search warrant that 'by its terms [takes] effect not upon issuance but at a specified future time.'"). "Most anticipatory warrants subject their execution to some condition precedent other than the mere passage of time – a so-called 'triggering condition.'" Grubbs, 547 U.S. at 94. The triggering condition for an anticipatory warrant must be "explicit, clear, and narrowly drawn," but should also be read in a commonsense rather than a hypertechnical fashion. United States v. Penney, 576 F.3d 297, 310 (6th Cir. 2009) (quoting Miggins, 302 F.3d at 395). Moreover, "the Fourth Amendment does not require that the triggering condition for an anticipatory search warrant be set forth in the warrant itself[.]" Grubbs, 547 U.S. at 99 (reversing Court of Appeals' decision invalidating anticipatory search warrant where the triggering condition was described in the affidavit but not mentioned in the warrant itself).

In Grubbs, the Supreme Court articulated "two prerequisites

-11-

of probability" an anticipatory warrant must satisfy in order to comply with the Fourth Amendment: "It must be true not only that *if* the triggering condition occurs 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' but also that there is probable cause to believe the triggering condition *will occur*." Id. at 96-97 (internal citation omitted) (emphasis in original). The search warrant affidavit must provide the issuing judicial officer "with sufficient information to evaluate both aspects of the probable-cause determination." Id. at 97.

The court finds Detective Tellez's affidavit contained sufficient information to establish probable cause to believe the triggering condition would occur. The affidavit stated OCU detectives had received information about Ardd from a reliable confidential informant, whose information in the past had led to over five felony drug arrests and convictions and the seizure of over five kilograms of powder cocaine, over ten pounds of marijuana, and over $500,000 in cash. This informant stated Ardd was involved in the sale and distribution of powder cocaine in Memphis and the informant had observed Ardd possessing, storing, and transporting both powder cocaine and crack cocaine in the past. Although the informant's information lacked specific details such as the location where he or she saw Ardd possessing, storing, and transporting cocaine, the drug

-12-

quantities involved, or when "in the past" the informant made
these observations, the information regarding Ardd's involvement
with drug trafficking was corroborated by Detective Tellez's
personal interactions with Ardd.  As stated in the affidavit,
Ardd had contacted Detective Tellez by phone several times over
the past year and had attempted to purchase kilograms of cocaine
from the detective.  On January 20, 2015, Ardd met in person
with Detective Tellez and said he would contact the detective
when he was ready to purchase cocaine.  On June 12, 2015, Ardd
contacted Detective Tellez and said he would be ready to
purchase nine ounces of cocaine on June 16.  The court finds,
based upon a totality of the circumstances, there was probable
cause the triggering condition would occur.

In addition, the court finds that once Ardd engaged in the
reverse buy of nine ounces of cocaine on June 16, there existed
probable cause that evidence of Ardd's drug trafficking activity
would be found at his residence.  A search warrant affidavit
must demonstrate a "nexus between the place to be searched and
the evidence sought." United States v. Carpenter, 360 F.3d 591,
594 (6th Cir. 2004) (en banc) (quoting United States v. Van
Shutters, 163 F.3d 331, 336-37 (6th Cir. 1998)).  While
Detective Tellez's affidavit did not contain any reference to
drug trafficking activity taking place in or around the
Castleman residence, the Sixth Circuit has explained that "[a]

-13-

magistrate may infer a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" United States v. Williams, 544 F.3d 683, 687 (6th Cir. 2008) (quoting United States v. Savoca, 761 F.2d 292, 298 (6th Cir. 1985)); see also United States v. Elbe, 774 F.3d 885, 889-90 (6th Cir. 2014).

Depending on the factual circumstances, "an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." Williams, 544 F.3d at 687. In United States v. Feagan, 472 F. App'x 382 (6th Cir. 2012), the court stated that "[i]t is well established that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home." Id. at 392 (citing United States v. Gunter, 551 F.3d 472, 482 (6th Cir. 2009); United States v. Goward, 188 F. App'x 355, 358-60 (6th Cir. 2006); Miggins, 302 F.3d at 393-94; United States v. Jones, 159 F.3d 969, 975 (6th Cir. 1998)); see also United States v. Masters, 591 F. App'x 452, 453-54 (6th Cir. 2015) (finding that issuing judge could reasonably infer that defendants used their residence to manufacture or store either methamphetamine or cooking ingredients, based upon information in affidavit that

-14-

both defendants had prior felony arrests for methamphetamine charges and one defendant engaged in suspicious purchase of pseudoephedrine pills); cf. United States v. McPhearson, 469 F.3d 518, 524-25 (6th Cir. 2006) (distinguishing Miggins and cases cited therein and stating, "in all those cases, the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes – namely, the independently corroborated fact that defendants were known drug dealers at the time the police sought to search their homes").

By contrast, the Sixth Circuit found that where the affidavit was "based almost exclusively on the uncorroborated testimony of unproven confidential informants . . . the allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence." United States v. Frazier, 423 F.3d 526, 533 (6th Cir. 2005). Nor did the Sixth Circuit find that the nexus requirement was satisfied in a case in which the defendant was arrested for simple assault while standing on his front porch, the officers found 6.4 grams of crack cocaine in his pocket, and they obtained a drug search warrant for his residence. See McPhearson, 469 F.3d at 524. More recently, the Sixth Circuit found an insufficient nexus where the defendant was a passenger in a vehicle driven by a suspected drug

-15-

trafficker during a heroin transaction, the defendant was found in possession of $4,813, a drug canine gave a positive alert to the defendant's vehicle parked in front of the drug trafficker's home, and the defendant's cell phone contained a text message that was consistent with a discussion of the price for cocaine.[5] See United States v. Brown, 828 F.3d 375, 382-85 (6th Cir. 2016). In reaching this conclusion, the Brown court stated

> In sum, our cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home – even if the defendant is a known drug dealer.

Id. at 384. The court noted, however, that it had previously found the nexus sufficient in cases in which the affidavit did not contain any facts showing that the residence had been connected to drug dealing activity. Id. at 383 n.2 (citing Miggins, Gunter, and United States v. Kenny, 505 F.3d 458, 461-62 (6th Cir. 2007)). In Miggins, the court found probable cause existed for the issuance of a search warrant for an apartment shared by Miggins and co-defendant McDaniels, where Miggins signed for a package containing one kilogram of cocaine at a different location under a false name. Even though the

---

[5]The court in Brown went on to find that the evidence supposedly establishing the defendant as a drug dealer was "inadequate," and furthermore, that the affidavit was so lacking in indicia of probable cause that the good-faith exception did not apply. Id. at 384-86.

affidavit contained no evidence of any drug trafficking activity
that took place at Miggins and McDaniels' apartment and
contained no other specific evidence of drug trafficking
activity by either defendant besides prior criminal history
involving cocaine charges for Miggins, the court determined that
these "facts clearly established a connection" between the
apartment and the other location where the drugs were delivered.
302 F.3d at 393.  Kenny involved the search of the home of a
suspected methamphetamine manufacturer.    The affidavit
supporting the search warrant established that Kenny had been
arrested the previous day, along with his son, in a pole barn
that contained a methamphetamine lab, a kilogram of
methamphetamine, and a large amount of methamphetamine-related
ingredients.  505 F.3d at 461-62.  An informant had also told
the police that Kenny was associated with the informant's
methamphetamine source, Kozma, who said that Kenny had been
cooking methamphetamine in the pole barn.  Id. at 460-62. The
court determined that this information constituted "substantial
evidence" that Kenny was engaged in manufacturing
methamphetamine.  Id. at 461.  The court found this information
sufficiently provided a nexus to support the search of Kenny's
residence because "a manufacturer's residence is as likely to
contain drug paraphernalia such as recipes, ingredients, and
records of sales as that of a dealer."  Id. at 462.    The

-17-

affidavit in <u>Gunter</u> contained evidence that the defendant was engaged in repeated purchases of kilogram quantities of cocaine, and "[b]ecause the quantity of the drugs and the repeated nature of the transactions made it reasonable to conclude that Gunter was engaged in ongoing drug trafficking, it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence." 551 F.3d at 481.

In the present case, Detective Tellez's affidavit stated OCU detectives had received information from a reliable confidential informant that Ardd was involved in the sale and distribution of powder cocaine in Memphis and the informant had observed Ardd possessing, storing, and transporting both powder cocaine and crack cocaine in the past. Ardd had communicated with Detective Tellez over the phone several times over the past year and had attempted to purchase kilograms of cocaine from the detective. On January 20 and June 12, 2015, Ardd had discussions with Detective Tellez regarding future purchases of cocaine and arranged to meet in person with the detective on June 16 to purchase nine ounces of cocaine from the detective. The affidavit further stated Ardd paid the utilities and registered his Cayenne at the Castleman residence, and that MPD detectives had observed his vehicle parked at the residence. In addition to providing verification that Ardd lived at the Castleman residence, the affidavit stated the detective knew

-18-

based on his training and experience that drug traffickers often hide their assets and drug proceeds, and retain drug records such as drug ledgers, at their residence. See Goward, 188 F. App'x at 359. Considering the totality of the circumstances, the court finds that Detective Tellez's affidavit contained sufficient specific, reliable information to reasonably establish that Ardd was engaged in ongoing drug trafficking activity, that the Castleman residence was in fact Ardd's residence, and that there was probable cause to believe evidence of drug trafficking activity would be found inside the residence once the triggering condition occurred.

2. Good-Faith Exception

Even if the court were to find that the search warrant was not supported by probable cause, the court would nevertheless conclude that the evidence discovered pursuant to the search should not be suppressed at trial, because the detectives' reliance on the warrant was objectively reasonable. See United States v. Leon, 468 U.S. 897, 922 (1984). The exclusionary rule is a "prudential doctrine" created by the Supreme Court to compel respect for the protections of the Fourth Amendment. Davis v. United States, 564 U.S. 229, 236 (2011). "Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." Id. (citing Stone v. Powell, 428 U.S. 465, 486 (1976)). The

Court has "repeatedly held" that "the rule's sole purpose . . . is to deter future Fourth Amendment violations." <u>Id.</u> (internal citations omitted); <u>see</u> <u>Herring v. United States</u>, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies. Indeed, exclusion 'has always been our last resort, not our first impulse.'") (internal citations omitted). After <u>Davis</u> and <u>Herring</u>, "only police conduct that evidences a deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights may outweigh the resulting costs. By contrast, where police act with an objectively reasonable good-faith belief . . . exclusion cannot pay its way." <u>United States v. Kinison</u>, 710 F.3d 678, 685 (6th Cir. 2013) (internal citations omitted). As the Sixth Circuit stated in <u>United States v. Justice</u>:

> Because the sole purpose of the exclusionary rule is to deter future Fourth Amendment violations, a criminal defendant must do more than demonstrate that the police violated the Fourth Amendment. He must show that suppressing the evidence will yield [r]eal deterrent value. That burden is especially relevant when officers follow the constitutionally preferred route, namely presenting evidence of illegal activity to a neutral magistrate who finds probable cause and issues a search warrant. To suppress the fruits of such a search, a defendant must show that, despite the magistrate's authorization, the police could not have relied on the warrant in good faith.

<u>United States v. Justice</u>, 461 F. App'x 415, 417 (6th Cir. 2012) (internal citations omitted) (alteration in original). In <u>Leon</u>,

the Supreme Court

> identified four specific situations in which an
> officer's reliance on a subsequently invalidated
> warrant could not be considered to be objectively
> reasonable: (1) when the warrant is issued on the
> basis of an affidavit that the affiant knows (or is
> reckless in not knowing) contains false information;
> (2) when the issuing magistrate abandons his neutral
> and detached role and serves as a rubber stamp for
> police activities; (3) when the affidavit is so
> lacking in indicia of probable cause that a belief in
> its existence is objectively unreasonable; and, (4)
> when the warrant is so facially deficient that it
> cannot reasonably be presumed to be valid.

United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005)

(citing Leon, 468 U.S. at 922-23); see also United States v.

Hodson, 543 F.3d 286, 292 (6th Cir. 2008).

The evidence before the court does not establish that the

detectives unreasonably relied on the warrant in searching

Ardd's residence.  There is no evidence that Detective Tellez

included false information in the affidavit or that the issuing

judicial officer abandoned his neutral and detached role.  For

the same reasons discussed in the probable cause analysis above,

the court finds that the affidavit was not so lacking in

probable cause so as to render a belief in its existence

objectively unreasonable, and the warrant was not so facially

deficient that it could not reasonably be presumed to be valid.

For all of these reasons, the court finds that the evidence

seized during the search of Ardd's residence should not be

suppressed.

**B.    Search Incident to Arrest**

The search of Ardd's person was a valid search incident to a lawful arrest.  "A warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed."  United States v. Abdi, 463 F.3d 547, 557 (6th Cir. 2006) (citing United States v. Watson, 423 U.S. 411, 417–24 (1976)).  It is well established that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that Amendment."  United States v. Robinson, 414 U.S. 218, 235 (1973); see also United States v. Montgomery, 377 F.3d 582, 586 (6th Cir. 2004).  The court finds that the officers had ample probable cause to arrest Ardd for attempting to purchase cocaine from the undercover detectives, and because his arrest was lawful, the officers could conduct a search of Ardd's person without running afoul of the Fourth Amendment.

**C.    Ardd's Post-Arrest Statement**

Finally, Ardd asserts that his post-arrest statement must be suppressed because it was obtained in violation of the Fifth Amendment.  To be admissible, a defendant's confession must be "made freely, voluntarily and without compulsion or inducement of any sort."  United States v. Binford, 818 F.3d 261, 271 (6th

Cir. 2016) (quoting Haynes v. Washington, 373 U.S. 503, 513 (1963)). Moreover, "[s]tatements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (citing Miranda v. Arizona, 384 U.S. 436, 478-79 (1966)). A defendant's waiver of his right against self-incrimination "must be both knowing and voluntary." United States v. Anderson, 695 F.3d 390, 394 (6th Cir. 2012) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). "In other words, the waiver must be both 'the product of a free and deliberate choice rather than intimidation, coercion, or deception' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Moran, 475 U.S. at 421); see also Binford, 818 F.3d at 271 ("The test for whether a Miranda waiver is voluntary is essentially the same as the test for whether a confession is voluntary.") (internal citations omitted). The court must determine if "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." Binford, 818 F.3d at 271

-23-

(citing <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir. 1999)). "The government bears the burden of proving — by a preponderance of the evidence — the voluntariness of both an accused's <u>Miranda</u> waiver and confession." <u>Id.</u> (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986)).

The court finds the government has met its burden of showing that Ardd knowingly and voluntarily waived his <u>Miranda</u> rights and that his post-arrest statement was made voluntarily and free of police coercion.[6]  The testimony and exhibits establish that before making the statement, Ardd was informed of his <u>Miranda</u> rights by the detectives.  Ardd was also given the Advice of Rights form, wrote his initials beside each right, and signed directly beneath a statement indicating he had read and understood his rights and was ready to answer questions without a lawyer present.[7]  After Ardd was presented with his typed statement, he reviewed and signed the statement.  Detectives Acred and Knowlton both testified Ardd was calm and cooperative throughout the interrogation, he never asked to have an attorney present, and he never asked to stop the interview.  Because Ardd's <u>Miranda</u> waiver was made knowingly and voluntarily, and

---

[6]It is uncontested that Ardd's statement was made pursuant to custodial interrogation within the meaning of <u>Miranda</u>.

[7]Ardd informed Detectives Acred and Knowlton that he had obtained a GED.

his statement was not the product of police coercion, the court finds no basis to suppress the statement.

### III. RECOMMENDATION

For the reasons above, it is recommended that the motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

March 2, 2017
Date

### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**